In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 24-1081

LAUREN RICHWINE and
DEATH DONE DIFFERENTLY LLC,

*Plaintiffs-Appellees,*

*v.*

KATHLEEN DIANE MATUSZAK, *et al.*,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:23-cv-00370-HAB-SLC — **Holly A. Brady**, *Chief Judge.*

_____

ARGUED JANUARY 15, 2025 — DECIDED AUGUST 28, 2025

_____

Before ROVNER, JACKSON-AKIWUMI, and MALDONADO, *Circuit Judges.*

ROVNER, *Circuit Judge.* The fortunate among us will have little experience burying loved ones. But even for those who confront the task more than their fair share, the many choices and details associated with a loved one's death can be overwhelming, particularly when in the throes of grief. Anticipating and arranging for one's own death is no less daunting.

"Death doulas," like Lauren Richwine, seek to make those arrangements easier. Through her company, Death Done Differently, Richwine helps her clients—the dying and their loved ones—with the many details surrounding dying and death.

Richwine does not have a license to practice funeral services, and the State of Indiana believes that Richwine is engaging in the unauthorized practice of that profession. Richwine believes that her services are protected under the First Amendment and that enforcement of the statute against her would constitute an unauthorized infringement upon her constitutional rights. The district court issued a preliminary injunction enjoining enforcement of the statute against Richwine and her business, Death Done Differently, and the state now appeals.

## I.

Through her business, Death Done Differently, Lauren Richwine offers services as a death doula. In her death doula capacity, Richwine discusses with her clients how they want to be remembered after death, helps clients write letters to loved ones, and provides emotional support to the dying. Richwine teaches families how to support the dying and, after an individual dies, she helps the survivors determine a funeral program, select services at the funeral home of their choice, and, under the supervision of a licensed funeral director, she verbally advises the survivors about the moving, bathing, and dressing of the deceased. She also attends the funeral. In addition to these services, Richwine educates her community and mentors other death doulas. Richwine is not a licensed funeral director, a fact her website mentions, but

she performs her duties "in conjunction with and under the supervision of a licensed funeral director." R. 26-1 at 3.

In 2021, an investigator for the Indiana Public Licensing Agency received a complaint about Richwine from a member of the funeral services industry, alleging that Richwine was engaged in the unlicensed practice of funeral services. After reviewing Death Done Differently's website, the investigator filed a report with the Indiana Attorney General's Consumer Protection Division requesting an investigation and a cease-and-desist letter. The Indiana Attorney General then opened an investigation.

The Attorney General's investigator informed Richwine of the complaint and gave her an opportunity to respond. Richwine replied that her services were not "funeral services" and that her role was primarily as an "educator and an advocate" who was "only able to raise awareness regarding a family's rights if they wish to care for their own loved ones after death." R. 1-5 at 2. Her response also highlighted the disclaimers on her website that her services "must be performed under the supervision of a licensed funeral director." *Id.*

After receiving Richwine's response, a Deputy Attorney General from the Office of the Attorney General moved for a cease-and-desist order against Richwine from the State Board of Funeral and Cemetery Service. The motion identified the following actions as the "practice of funeral service": "discussion of funeral options, body disposition (cremation, traditional burial, or green burial), service choices, etc.," "assistance with paperwork such as living will, DNR form, and healthcare power of attorney," "verbal guidance with loved ones under the direct supervision of a licensed funeral director for moving, bathing, dressing, and arrangement of the

deceased," "consultation with family in regard to personal information about the family, music and reading selections, religious acknowledgements (if any) and programming," visits, including "readings, music, conversation, healing touch, or general companionship with the dying individual," and "accompaniment to funeral home, review of general price list, support with selection of goods and services, presence at funeral service." R. 1-7 at 4.

Richwine's counsel contacted the Deputy Attorney General to pursue settlement negotiations. The parties exchanged drafts of a cease-and-desist agreement. During the drafting process, Richwine's counsel added the italicized language to the following sentence: "[r]espondents shall refrain from counseling consumers, *whether individually or in educational events open to the public*, in any manner and through any medium, concerning the methods and alternatives for the final disposition of human remains." R. 26-11 at 7.

The finalized agreement contains multiple references to Indiana law, including that Richwine and her company waive their rights under Indiana law. The waiver provision makes no mention of federal law. The agreement also lays out the relevant background information and points of Indiana law, and it ends with the statement that, "[i]n light of the foregoing, the Parties hereby agree that the Board may, without further notice or formal proceeding, issue the following Order." R. 11 at 9. The cease-and-desist order demands that Richwine and Death Done Differently cease advertising and providing the following three categories of services:

> 1) Full End of Life Planning […] which includes
> discussion of funeral options, body disposition
> (cremation, traditional burial, or green burial),

service choices. […] and assistance with paper-work such as living will, DNR form, and healthcare power of attorney.

2) Facilitation of Community Death Care […] which includes verbal guidance with loved ones for the moving, bathing, dressing, and arrangement of the deceased, as well as consultation with the family in regard to personal information about the family, music and reading selections, religious acknowledgements (if any) and programming.

3) Support with Funeral Home […] which includes accompaniment to the funeral home, review of general price list, support with selection of goods and services, presence at funeral service.

R. 11 at 6–7, 9 (citation modified).

Shortly after the Board approved the cease-and-desist order, Richwine and Death Done Differently filed suit alleging that enforcement of the Indiana statute would constitute an unconstitutional infringement upon their First Amendment rights. In the complaint, plaintiffs sought declaratory and injunctive relief. After briefing from the parties, the district court granted the plaintiffs' request for a preliminary injunction. The defendants now appeal.

## II.

The defendants make two threshold arguments—namely that plaintiffs waived their right to bring suit and that the suit is barred by federal abstention. We address each of these

arguments first and, because we find neither meritorious, we then turn to the merits.

**A.**

First, defendants argue the plaintiffs waived their rights by signing the cease-and-desist agreement. We disagree.

Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Individuals are permitted to waive their constitutional rights. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 930 (2018). However, "waiver of a constitutional right must be clear and unmistakable." *Krieg v. Seybold*, 481 F.3d 512, 517 (7th Cir. 2007). "[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and […] we do not presume acquiescence in the loss of fundamental rights." *Johnson*, 304 U.S. at 464 (citation modified); *Fuentes v. Shevin*, 407 U.S. 67, 95–96 (1972). A waiver of First Amendment rights "must be freely given and shown by 'clear and compelling' evidence." *Janus*, 585 U.S. at 930 (quoting *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 145 (1967)).

The defendants argue that the plaintiffs waived their First Amendment rights by signing the cease and desist agreement, but surveying a few cases that are examples of effective constitutional rights waivers illuminates the requirement of clear and unmistakable waiver.

In *Snepp*, for example, "Snepp had executed an agreement promising that he would 'not … publish … any information or material relating to the [CIA], its activities or intelligence activities generally, either during or after the term of [his] employment … without specific prior approval by the Agency.'"

*Snepp v. United States*, 444 U.S. 507, 507–08 (1980). Before the Supreme Court, Snepp claimed that this agreement was "unenforceable as a prior restraint on protected speech." *Id.* at 509 n.3. The Supreme Court, noting the unique security concerns facing the CIA, declined to find the agreement unenforceable and imposed a constructive trust on the profits stemming from Snepp's breach. *Id.* at 509 n.3, 516.

Similarly, in *Domka v. Portage County, Wisconsin*, Domka signed an agreement containing the following clause: "[a]ny alcohol reading on the [alcohol breath-test machine] will result in immediate removal from [the Home Detention Program] and you will lose your [Home Detention Program] and Huber Privileges." 523 F.3d 776, 779 (7th Cir. 2008). When Domka registered a positive reading on the alcohol breath test machine and subsequently lost his privileges, he challenged the loss as a violation of his due process rights. *Id.* This court disagreed, finding "that Domka waived any due process protections that *may* have been required." *Id.* at 781 (emphasis in original). In so finding, this court pointed to the unambiguous language of the contract and Domka's confessed understanding "that if he violated any condition of the [Home Detention Program], including the [alcohol breath test] portion of the program, he would be removed from the program without notice." *Id.* at 782.

In *Romeril*, the Second Circuit faced a similar claim. There, Romeril entered a consent agreement with the Securities and Exchange Commission that contained the following language:

> Defendant understands and agrees to comply with the [SEC]'s policy not to permit a defendant … to consent to a judgment or order that

> imposes a sanction while denying the allegation in the complaint[.] In compliance with this policy, Defendant agrees not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis.

*Sec. & Exch. Comm'n v. Romeril*, 15 F.4th 166, 170 (2d Cir. 2021) (citation modified). Later, Romeril claimed this restriction was an unconstitutional prior restraint on his First Amendment rights. *Id.* The Second Circuit disagreed, finding that "[t]o the extent Romeril had the right to publicly deny the SEC's allegations against him, he waived that right by agreeing to the no-deny provision as part of a consent decree." *Id.* at 173.

The throughline from these examples, of course, is the clear and unambiguous nature of the agreement. In each case, it was clear from the face of the document which rights the signatory chose to waive. This clarity reflects the admonitions that waiver is the "*intentional* relinquishment or abandonment of a known right" *Johnson*, 304 U.S. at 464 (emphasis added), and "waiver of a constitutional right must be *clear and unmistakable*." *Krieg*, 481 F.3d at 517 (emphasis added). And, indeed, when the agreement is ambiguous, the Supreme Court has declined to find waiver. For example, in *Fuentes*, the signatory (Fuentes) purchased certain home items from the Firestone Tire and Rubber Company "under a conditional sales contract calling for monthly payments over a period of time." *Fuentes*, 407 U.S. at 70. "Under the contracts, Firestone retained title to the merchandise, but Mrs. Fuentes was entitled to possession unless and until she should default on her

installment payments." *Id.* Following a dispute about servicing one of the home items, Firestone sought to repossess the home items claiming that Fuentes refused to make further payments on the items. *Id.* Fuentes claimed that she had Fourteenth Amendment rights that prevented Firestone from repossessing the items without a prior hearing. *Id.* at 71. Firestone claimed that she waived her procedural due process rights by signing the sales contract. *Id.* at 94. Fuentes's contract stated, "in the event of default of any payment or payments, Seller at its option may take back the merchandise" and other plaintiffs—whose suit the Court reviewed at the same time as Fuentes's—had contracts stating, "the seller may retake or repossess the merchandise in the event of a default in any payment." *Id.* (citation modified). But despite these statements, the Supreme Court was unconvinced that the plaintiffs had waived their due process rights, particularly because "[t]he contracts included nothing about the waiver of a prior hearing." *Id.* at 95–96. Even though the contracts outlined the "seller's right to repossession upon occurrence of certain events," that did not constitute waiver of the buyer's constitutional rights. *Id.* at 96.[1]

With this context, we turn to the agreement here to see whether it demonstrates a knowing, voluntary, and intelligent waiver of the sort recognized in *Snepp*, *Domka*, and

---

[1] The defendants also rely upon *In re George F. Nord Building Corporation*, but that case teaches the same lesson as *Fuentes*. *See In re George F. Nord Bldg. Corp.*, 129 F.2d 173, 176 (7th Cir. 1942) (stating that "a party to a proceeding wherein a consent decree has been entered and who has been a party to that consent, is in no position to claim that such decree restricts his freedom of speech. He has waived his right and given his consent to its limitations *within the scope of that decree*.") (emphasis added). The written agreement remains the touchstone for the scope of the waiver.

*Romeril*. Immediately, we can rule out the waiver provision of the contract as providing the source of the waiver, as the waiver provision explicitly limits itself to Indiana law. R. 11 at 6 ("Respondents voluntarily, knowingly, and intelligently waive each of these rights under Indiana law[.]"). The defendants point us, instead, to the latter portion of the agreement, which contains the cease and desist agreement. But there, we find wording similar to the wording of *Fuentes.* Specifically, that under the government's interpretation of Indiana law, "the Board may, without further notice or formal proceeding, issue the following Order." R. 11 at 9. Indeed, we see no indication from the face of the document that the plaintiffs agreed not to bring suit in federal court under federal law. *Cf. Am. Homeland Title Agency, Inc. v. Robertson*, 930 F.3d 806, 809 (7th Cir. 2019) (finding waiver of judicial review when consent decree stated the signatory "voluntarily and freely waive[d] the right to judicial review of th[e] matter"). And even though the cease-and-desist portion of the agreement does contain prohibitions on some of the plaintiffs' activities, the agreement importantly does not state that the plaintiffs agree to refrain from those activities. It is, instead, a series of commands from the Board that Richwine and Death Done Differently stop doing certain actions. And, indeed, the fact that Indiana law prohibits the plaintiffs' activities is exactly what this matter challenges.

This is why *Snepp*, *Romeril*, and *Domka* cannot direct the outcome here. In each of those cases, the signatory challenged the agreement that was made. *See also Am. Homeland Title Agency, Inc.*, 930 F.3d at 811 ("[E]ach of the requested remedies is directly keyed to undoing some sanction imposed by the agreement[.]"). Indeed, the plaintiffs in these cases attempted to get out of the very contract they signed by

claiming that the contract itself violated the Constitution. The plaintiffs do not challenge the agreement Richwine signed, they challenge the Indiana law that prevents her from operating her business. Unlike *Snepp*, *Romeril*, and *Domka*, her suit is forward-looking. Richwine is concerned about the enforcement of the law against her in the future. In short, we find no indication from the cease-and-desist agreement that the plaintiffs agreed not to bring suit under the First Amendment—or any other federal law—in federal court.

**B.**

Next, the defendants argue that federal abstention doctrine precludes us from considering the plaintiffs' suit. Specifically, the defendants rely upon *Younger v. Harris*, 401 U.S. 37 (1971). Under *Younger*, abstention is required if the ongoing state matter (1) is judicial in nature, (2) implicates important state interests, (3) offers an adequate opportunity for review of constitutional claims, and (4) involves no extraordinary circumstances, such as harassment or bias. *See FreeEats.com, Inc. v. Indiana*, 502 F.3d 590, 596 (7th Cir. 2007) (citing *Majors v. Engelbrecht*, 149 F.3d 709, 711 (7th Cir. 1998)).

*Younger* abstention exists to ensure that certain state proceedings occur without federal court interference, despite a request to the contrary. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77–78 (2013); *Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 815 (7th Cir. 2014) (describing the three types of proceedings that warrant *Younger* abstention). But "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). "Federal courts […] have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Sprint*

*Commc'ns, Inc.*, 571 U.S. at 77 (citation modified). "Where there is no serious threat of interference, federal courts have a 'virtually unflagging obligation' to resolve the questions before them." *Vega v. Chicago Bd. of Educ.*, 109 F.4th 948, 957 (7th Cir. 2024), *reh'g denied*, No. 23-1183, 2024 WL 4291221 (7th Cir. Sept. 25, 2024) (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 817). That is why our "threshold question—even before the question of whether a court should abstain—is whether the federal action threatens to interfere with or intrude upon a state court proceeding." *Id.*

The defendants argue that the Board maintains jurisdiction and, therefore, a state proceeding is ongoing. The defendants do not describe the status of the ongoing proceeding or the actions pending in the state proceeding, nor do the defendants explain when the ongoing proceeding will terminate. Instead, their position appears to be that the state proceeding will go on in perpetuity, even if no further action by Richwine, Death Done Differently, or the state takes place, because the Board "maintains jurisdiction" over the matter.

Despite the defendants' insistence to the contrary, we do not see an ongoing state proceeding. Certainly, there was an action by the state against the plaintiffs, but that action ended before the plaintiffs filed suit. *Greening v. Moran*, 953 F.2d 301, 305 (7th Cir. 1992) ("Now that the state proceeding has reached its end, abstention is no longer appropriate."). The agreement, signed by the state, emphasizes the termination of the action. R. 11 at 6 (Respondents waive their rights under Indiana law "to terminate the proceedings before the Board"). Not only is it termed a "Final Order," but it states, "this is a final disposition and is not subject to further review." R. 11 at 11. And if the state wishes to enforce the agreement, the

Indiana Attorney General—not the Board—must "seek enforcement […] in a circuit or superior court." *Id.* at 10. In other words, for any further action to take place, a state actor—a different state actor from the Board, before whom the claimed ongoing action is pending—must institute a new and separate state action, which can be done "without further motion or action from the Board." *Id.*

But even setting aside the logistical indicators of finality, the defendants do not explain how federal court action could possibly interfere with the claimed state proceeding. In contrast to cases warranting *Younger* abstention, the plaintiffs have not challenged the Board or the final agreement in lieu of responding to or engaging in an ongoing state process. *See e.g.*, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 6 (1987); *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 429 (1982); *Majors*, 149 F.3d at 711–13. In fact, the Board's finished proceedings are of little relevance to the plaintiffs' current claims, as they seek relief from *prospective* enforcements of the statute against them. *See* R. 1 at 33; *Wooley v. Maynard*, 430 U.S. 705, 711 (1977) (*Younger* abstention is inappropriate "since the relief sought is wholly prospective, to preclude further prosecution under a statute alleged to violate appellees' constitutional rights"). And, moreover, the defendants stated before the district court that "administrative officers lack the authority to assess the validity of a statu[t]e." R. 34 at 12. Indeed, "[t]hat agencies may not nullify statutes has long been the law." *Consol. Rail Corp. v. Smith*, 664 F. Supp. 1228, 1233 (N.D. Ind. 1987) "Abstention certainly accomplishes nothing if the federal plaintiff cannot even raise its federal constitutional challenges in the state proceeding; it merely delays the inevitable federal action following the state proceeding and postpones the possible vindication of the federal plaintiff's

constitutional rights." *Mannheim Video, Inc. v. Cnty. of Cook*, 884 F.2d 1043, 1045 (7th Cir. 1989). Under these circumstances, it is unclear how the ongoing proceeding "offer[s] an adequate opportunity for review of constitutional claims." *FreeEats.com, Inc.*, 502 F.3d at 596 (citation modified). Seeing no possibility for interference with an ongoing state proceeding, we see no justification for abstaining under *Younger*. *Vega*, 109 F.4th at 957.

**III.**

We now turn to the merits of the plaintiffs' case. In reviewing the district court's grant of a preliminary injunction, we review the district court's legal conclusions de novo, its findings of fact for clear error, and its balancing of the harms for an abuse of discretion. *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 545 (7th Cir. 2020). "We will not reverse a district court's grant or denial of a preliminary injunction absent a clear abuse of discretion by the district court." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (citation modified*)*.

"To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (citation modified); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Additionally, the plaintiffs must show that the balance of the equities tips in their favor, and an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). "[A]n applicant for preliminary relief bears a significant burden, even though the Court recognizes that, at such a preliminary stage, the

applicant need not show that it definitely will win the case."
*Illinois Republican Party*, 973 F.3d at 763.

The parties agree that the plaintiffs' speech is guaranteed some level of First Amendment protection. They dispute, however, the appropriate level of scrutiny with which we should view the statute and, in turn, whether the plaintiffs are likely to succeed on the merits of their claims.[2] The plaintiffs urge us to apply—and the district court did apply—strict scrutiny on the basis that the Indiana statute regulates speech based on its content. The defendants, by contrast, argue that intermediate scrutiny applies because the statute simply regulates conduct, with any regulation on speech being an unintended byproduct.

We begin our analysis by outlining the Supreme Court's directions on identifying and analyzing content-based statutes, which warrant strict scrutiny.

**A.**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they" satisfy strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). But "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

---

[2] Because the defendants do not claim that the district court erred in analyzing the remaining preliminary injunction factors, we do not analyze them in this opinion.

In *Reed*, the Supreme Court provided a "commonsense meaning of the phrase 'content based'" that a regulation "is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. But the mere "examination of speech or expression" does not automatically trigger First Amendment concern warranting strict scrutiny. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73–74 (2022). And "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014); *see also Brown v. Kemp*, 86 F.4th 745, 780 (7th Cir. 2023); *Id.* at 69 (upholding statute where the "examination of speech" was "agnostic as to content" and done "only in service of drawing neutral, location-based lines").

If, on the other hand, a statute primarily regulates conduct and only "incidentally burden[s] speech," then it need not survive strict scrutiny. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 769 (2018) ("*NIFLA*"); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017).[3] But just because the statute could be described as a regulation of conduct does not mean that it functions as a regulation of conduct that only incidentally burdens speech. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010). Even if a law could generally "be

---

[3] *NIFLA* also subjects "factual and uncontroversial" required disclosures to a lower level of scrutiny, *see NIFLA*, 585 U.S. at 768–69 (citation modified), and the defendants argue that the plaintiffs' speech also falls into that exception. Op. Br. at 36–38. The defendants, however, do not specify what required disclosure the plaintiffs failed or refused to make, nor do the plaintiffs argue that any disclosure that they are required to give is an infringement upon their First Amendment rights. This exception, therefore, does not apply here.

described as directed at conduct," if "the conduct triggering coverage under the statute consists of communicating a message," then it is impermissibly content-based as applied. *Id.*

The division between speech and conduct has not been evenly applied throughout the country, particularly when it comes to licensing schemes that determine which individuals can speak about certain topics. *Compare Hines v. Pardue*, 117 F.4th 769, 777 (5th Cir. 2024) (statute that requires physical examination of animal before providing veterinary advice "primarily regulates speech—and not merely incidentally to […] conduct"), *and Billups v. City of Charleston* 961 F.3d 673, 682–83 (4th Cir. 2020) (ordinance requiring that tour guides obtain a license before giving paid tours "undoubtedly burden[ed] protected speech"), *and Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1070–71, 1073 (9th Cir. 2020) (statute restricting enrollment by certain students in private post-secondary schools implicated speech more than incidentally and was content-discriminatory, warranting heightened scrutiny) *with 360 Virtual Drone Services, LLC v. Ritter*, 102 F.4th 263, 278 (4th Cir. 2024) (statute preventing the creation and sale of maps or models of land was conduct-based), *and Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1216–17, 1225–26 (11th Cir. 2022) (statute that prevented non-licensed individuals from providing advice about "dietary choices, exercise habits, and general lifestyle strategies" burdened speech only incidentally to regulating conduct).

Here, the statute restricts the "practice of funeral service," which includes "the counseling of individuals concerning methods and alternatives for the final disposition of human remains." Ind. Code § 25-15-2-22. As applied to the plaintiffs, Indiana claims that a variety of speech-based activities

constitute the unauthorized practice of funeral services. These activities include, but are not limited to, discussing options for the final disposition of human remains, including traditional burial, green burial, or cremation; helping survivors decide what should be included in the funeral program; supporting survivors while they pick products and services at the funeral home; and reviewing the funeral home's price list. R. 11 at 6–7. At first blush, it certainly seems that the "conduct triggering coverage under the statute consists of communicating a message." *Holder*, 561 U.S. at 28. But the state argues that it is not the content of the speech, it is the plaintiffs' lack of a license that triggers the statute.

The statute clearly burdens speech that is protected by the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("As the majority below put it, [i]f the acts of disclosing and publishing information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.") (citation modified). That the plaintiffs' speech[4] is subject to some level of protection is not in dispute.

---

[4] In passing, Indiana references an isolated incident in which Richwine and a hospice nurse shrouded a body, applied scented oils to the deceased individual's skin, dressed the deceased individual, and placed ice packs to prevent decomposition "until the funeral home came" to remove the body at the request of a client. *See* Op. Br. at 43 n.4; R. 1-6 at 3. In an affidavit, a cemetery superintendent stated that he recalled one instance in which Richwine shrouded a body with the family. R. 26-13 at 3. But the plaintiffs do not argue that these activities constitute speech, nor

(continued)

Even though the parties vigorously dispute which level of scrutiny should apply, we find no need to determine whether the statute should be subject to strict or intermediate scrutiny because, even under intermediate scrutiny, the statute fails to pass constitutional muster as applied to Richwine and Death Done Differently, based on the interests articulated by the state. This path—declining to decide the appropriate level of scrutiny when a statute would fail even under a lower level of scrutiny—is well trod. *See e.g.*, *McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (declining to decide appropriate constitutional standard because law failed to pass more lenient standard).

**B.**

"A statute survives intermediate scrutiny if it 'advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. ---, 145 S. Ct. 2291, 2317 (2025) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997)); *Tagami v. City of Chicago*, 875 F.3d 375, 378–79 (7th Cir. 2017), *as amended* (Dec. 11, 2017). "There must be a reasonably close fit between the law's means and its ends […] though perfect calibration is not required." *Nicodemus v. City of South Bend*, 137 F.4th 654, 668 (7th Cir. 2025) (citation modified). "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." *McCullen*, 573 U.S. at 486 (citation modified). Because the plaintiffs challenge the statute as applied, we focus only on the facts and circumstances of

---

does the injunction permit the plaintiffs to engage in these activities. *See* R. 50.

this case and do not opine as to whether another scenario would warrant a different outcome. *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 954 (7th Cir. 2015).

Here, the state claims that the statute furthers the following interests: 1) preventing the spread of infectious and contagious diseases from human remains; 2) protecting general health, public safety, and the environment; and 3) consumer protection. The state argues that, by restricting who can counsel individuals on the final disposition of human remains, the statute furthers each of these interests. We do not doubt that—in the abstract—the state has an interest in protecting the public and the environment from disease and fraud. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."). However, the method by which the state furthers these interests must not mean that "a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). As applied to the plaintiffs, the statute prevents a wide range of speech activities, including helping survivors determine what music they want played at their loved one's funeral.

This approach furthers the state's interests the way an atom bomb would further the eradication of a residential ant infestation. It goes much too far. We do not see how preventing the plaintiffs from telling a client about his or her options for the final disposition of their loved one's remains furthers the state's professed interests. The plaintiffs do not claim that

they can perform a cremation, a green burial, or a traditional funeral, nor does the state argue that they counsel clients on how to do these things themselves. Indeed, the plaintiffs specify that they do not "perform any services that funeral directors are licensed to direct such as body care, death certificate filing, transportation, or making arrangements" and that their clients must "hire a funeral director." R. 1-3 at 7. The state does not explain to us how, under these circumstances, a consumer learning from Richwine or Death Done Differently that green burial is an option for the final disposition of human remains poses a threat to the consumer or the public. "[I]nformation is not in itself harmful […] people will perceive their own best interests if only they are well enough informed, and […] the best means to that end is to open the channels of communication rather than to close them." *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976). Thus, to the extent that the state wants to prevent its citizens' access to this information about their options, that is the very type of overregulation that the First Amendment requires us to view with heavy skepticism. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (opinion of Stevens, J.) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").

The state claims that plaintiffs improperly state on their website that "the individual given authority to determine [the] final disposition of the body has up to 72 hours or three days from the time of death to contact the funeral home of their choice. In most cases you do not need to have the body removed immediately following the death. Death is not an emergency." R. 26-1 at 2–3. This statement, the state argues,

could possibly hurt the individual consumer or public health. But Indiana law does indeed give the individual with authority 72 hours "after the person receives notification of the death" to exercise his or her rights to "designate the manner, type, and selection of the final disposition of human remains, to make arrangements for funeral services, and to make other ceremonial arrangements after an individual's death." Ind. Code § 25-15-9-18. If that individual does not exercise his or her rights, then "the right to determine final disposition passes to the next person" described in the state's delineated hierarchy of individuals vested with that authority. *Id.* To illustrate the harm posed by the plaintiffs' statement, the state relies upon an affidavit in which the affiant—an investigator with the Indiana Professional Licensing Agency—reports that she has "been in the presence of dead bodies that are improperly stored" and "without sufficient cooling and/or embalming" a decaying body can "present a potential public health concern." R. 26-1 at 3. Certainly, dead bodies left to nature will decay. But it is not clear how the plaintiffs' speech, which seemingly tracks Indiana law, increases the likelihood that a dead body will be left until that point. Perhaps there are other laws that require a quicker removal of a body. *But see* Ind. Code § 23-14-54-1 ("[R]emains of all individuals who die in Indiana […] shall be deposited […] within a reasonable time after death, except as ordered by the Indiana department of health."). But based on the record before us, we struggle to see the public health harm posed by the plaintiffs' description of Indiana law.

Similarly, we do not see how the statute furthers the state's interest in consumer protection by depriving its citizens of the opportunity to have a neutral third party assist survivors in selecting which items and services to purchase from a funeral

home. The plaintiffs' services protect consumers who are likely to benefit from the perspective of an individual who has no financial stake in the purchase. Contrary to the state's assertion, the plaintiffs are not providing the same service as the funeral home. Funeral homes have a financial stake in the purchases customers make. The plaintiffs have none. Both Consumer Reports Magazine and car dealership salespeople help car shoppers select cars, but no one would claim that they provide the same service.

Finally, we fail to see any connection between preventing the plaintiffs from helping survivors determine how to integrate their loved one's biographical information, preferred music, readings, religious practices and other programming into funerals and the state's professed interests. Although a funeral director could provide the same service, if a survivor would prefer the plaintiffs' help to that of a funeral director, then we see no harm in permitting them to make that choice.

Rather than connecting the dots between the statute's means and ends, the state emphasizes that Richwine is free to "engage in advocacy and educational activities about death as she sees fit," so long as her speech falls outside of the statute's sweep. Reply Br. at 24. We note that it makes no difference for our First Amendment analysis that the plaintiffs sell their advice to consumers. *NIFLA*, 585 U.S. at 767 ("Speech is not unprotected merely because it is uttered by professionals."). And as applied to the plaintiffs, the statute burdens almost the entirety of their professional speech. Even though the plaintiffs can engage in some other forms of speech, that does not demonstrate that the statute is well-tailored to achieve its interests, nor does it mean that the statute does not burden "substantially more speech than is necessary." *Turner*

*Broad. Sys., Inc.*, 512 U.S. at 662 (citation modified). All speech-related statutes leave some speech unregulated. Our inquiry is whether substantially more speech than necessary falls within the regulation's purview. *Id.*; *Ward*, 491 U.S. at 799.

Some additional considerations further illustrate the poor fit between the statute's means and its ends. For example, no consumer has ever complained about Richwine or Death Done Differently, nor has the state been able to identify any harm that Richwine has caused as a death doula. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. at 664 ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. […] It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.") (citation modified). Given that the plaintiffs make clear that the client must hire a licensed funeral director, the possible risk to consumers appears quite low. And, more perplexingly, other individuals or entities are permitted to "arrange[], supervise[], or conduct[] a religious or memorial service for a deceased individual" with the deceased individual's remains present so long as a licensed funeral director will complete the final disposition of human remains and obtain a burial permit. Ind. Code § 25-15-2-10(6)(B).

As applied, the statute prevents the plaintiffs from telling clients that cremation is an option for the final disposition of a loved one's remains, that a survivor does not need to purchase the most expensive casket offered, or that reading a loved one's favorite poem would be a meaningful way to remember him or her. In light of the state's articulated interests

and the statute as applied to the plaintiffs, the plaintiffs are likely to succeed on the merits of their First Amendment claim.[5]

## IV.

Finally, we turn to the restrictions on the plaintiffs advertisements. The parties agree that the advertisements are commercial speech. Commercial speech is protected by the First Amendment if it is lawful and not misleading. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564, (1980) ("If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed.").

Indiana argues that because the statute prohibits the plaintiffs from engaging in the advertised activities, the advertisements are therefore misleading. This argument, of course, depends on whether the statute's restrictions are constitutionally appropriate. Because we find that the plaintiffs are likely to succeed on the merits of their speech claim, they are also likely to succeed on the merits of their advertising claim.

## V.

Not everyone who experiences the death of a loved one will have a trusted companion to call for assistance and guidance on how to proceed. In the name of consumer protection, health, and safety, Indiana prevents Richwine and Death Done differently from filling that role of trusted companion.

---

[5] In an undeveloped footnote, the defendants argue that the preliminary injunction should be narrowed to exclude certain disclosures. But by failing to meaningfully develop this argument, Indiana has waived it. *Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.*, 848 F.3d 822, 829 (7th Cir. 2017).

The state's means are disproportionate to its articulated interests and therefore we find that the plaintiffs are sufficiently likely to succeed on their claims that the statute impermissibly infringes on their First Amendment Rights.

For the reasons stated above, we AFFIRM the injunction of the district court and remand for further proceedings consistent with this opinion.